John LEACH, Intervenor, Appellant,

v.

**CRUCIBLE CENTER COMPANY** et al., Appellees.

**No. 6986.**

United States Court of Appeals
First Circuit.

Jan. 22, 1968.

Alan S. Flink, Providence, R. I., with whom Letts & Quinn, Providence, R. I., was on brief, for appellant.

Leonard Decof, Providence, R. I., with whom John H. Hines, Jr., and Aisenberg, Decof & Dworkin, Providence, R. I., were on brief, for Henry Hudes and others, appellees.

Matthew W. Goring, Providence, R. I., and George M. Vetter, Jr., New York City, on brief for Crucible Center Company, appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

In this diversity action for specific performance of an agreement to sell certain real estate owned by the defendant, Crucible Center Company, in the City of Providence, the district court found for plaintiffs, Hudes and Marquardt, and ordered Crucible to convey the real estate. Appellant Leach, who intervened as a party plaintiff, contends that the alleged agreement upon which Hudes and Marquardt rely is unenforceable by reason of the Statute of Frauds; that he is entitled to specific performance of his contract to purchase this real estate and that the court erred in dismissing his complaint. Crucible did not appeal. At this stage of the proceeding it takes the position that it is "a virtual stake-holder."

The events that gave rise to these conflicting claims are as follows. Crucible engaged a broker named Hurley, amongst others, to sell the real estate in question.[1] On August 4, 1965, one Eastwood, an associate of Hurley, and another broker named Sydney, showed the premises to both of the parties. On said date Leach offered $90,000 for the property and stated that a check for $10,000 in support of this offer would be available from his

---

1. In its letter engaging the brokers, Crucible specified the sale price as $120,000 cash or such other price or terms that it may subsequently agree to accept therefor. It also provided that the brokers submit to it in writing "all offers received (regardless of price)" and that it may accept or reject the same in accordance with its business judgment.

attorney in about thirty minutes.[2]  Later that day Hudes and Marquardt (hereinafter "plaintiffs") made an offer of $100,000 and delivered a deposit of $10,000 to Eastwood who gave them a detailed receipt.[3]  On the same day Hurley transmitted this offer by telephone to one Thomas, the person at the main office of Crucible in Pittsburg with whom he had been instructed to deal.  In recommending acceptance, he stated that plaintiffs wanted an answer that day.  That afternoon Thomas telephoned Hurley that he had talked with one of the officers of the company and that the officer had indicated that the plaintiffs' offer was acceptable.  During this conversation the terms of the agreement to be prepared by Hurley were discussed in some detail.[4]  Hurley prepared the sales agreement and on the following day (August 5) wrote a letter to plaintiffs' attorney notifying him of Crucible's acceptance.  He also attached the sales agreements for plaintiffs' signature.  These agreements were executed and returned to Hurley who forwarded them to Thomas on August 9, together with the $10,000 check.

After learning that plaintiffs' offer had been accepted, Leach immediately contacted one Rinehart, an official of Crucible, gave his version of the events of August 4 and made an offer of $120,000 for the property.[5]  In reliance upon Leach's representations, Crucible accepted this offer, informed the plaintiffs it did not intend to convey the real estate to them and returned the agreements unsigned.  Shortly thereafter, plaintiffs commenced suit and the sale to Leach was enjoined pending the outcome of the case.

■■■  By stipulation, the case was heard on the record of the evidence adduced at the hearing on preliminary injunction,[6] plus an affidavit subsequently made by Rinehart.[7]  The trial court made a number of findings which Leach complains are not supported by the evidence.[8]  From our examination of the

2.  This check was not picked up by either broker, nor was it ever delivered to Hurley.

3.  The check was drawn by Marquardt-Hudes, Inc., a corporation of which the plaintiffs were the sole owners.  Likewise, Hurley's receipt, dated August 4, 1965, and signed by Eastwood ran to the corporation.

4.  At no time up to this point, however, did Hurley mention to Thomas the Leach offer of $90,000.  He testified that he did not consider he had an offer from Leach "because Mr. Leach in the past had indicated he was going to make offers and nothing materialized; and that normally we do not consider an offer that is not accompanied by a check or in writing as a bona fide offer."

5.  Leach told Rinehart that after viewing the property and believing the sale price to be $125,000, he made an offer of $120,000; that one of the brokers dissuaded him and told him to make an offer of $90,000 and a deposit of $10,000; that he then made an offer of $90,000 which was prior to plaintiffs' offer and left his deposit check with his attorney within an hour thereafter; that Hurley had not attempted to contact his attorney concerning this offer and that he was now making this new offer.  He confirmed the

new offer by telegram and wired a deposit of $12,000.

6.  The hearing on preliminary injunction was held before the chief judge of the district court who, after making findings of fact, granted plaintiffs' motion for injunctive relief.  The chief judge did not, however, hear the case, on the merits.

7.  This affidavit was submitted in connection with Crucible's answer demanding dismissal of Leach's complaint on the ground that he knowingly made certain false representations thereby inducing the defendant to accept his offer.

8.  The trial court found:
    "1.  That the plaintiffs Henry Hudes and Max Marquardt offered to purchase the real property described in the complaint from the defendant Crucible Center Company for the sum of $100,000.00.
    2.  That the defendant Crucible Center Company accepted plaintiffs' said offer.
    3.  That the intervenor John Leach made no offer to purchase said real property until after plaintiffs' said offer had been accepted by defendant Crucible Center Company and the intervenor had been advised of same.
    4.  That the real estate brokers involved in this transaction had authority to act for the defendant Crucible Center Com-

record we cannot say that these findings are clearly erroneous. Leach maintains, however, that in this case we are not bound by the clearly erroneous test of Fed.R.Civ.P. 52(a), since the district court reached its determination on the basis of documentary evidence only. We do not agree with this interpretation of rule 52(a). The Supreme Court has held that the "clearly erroneous" rule is applicable even where a finding is based on documentary evidence or undisputed facts. United States v. Singer Mfg. Co., 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963); United States v. U. S. Gypsum Co., 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746 (1948). See also Collins v. C.I.R., 216 F.2d 519 (1st Cir. 1954); Texas Co. v. R. O'Brien & Co., 242 F.2d 526, 529 (1st Cir. 1957) (dictum); 2B Barron and Holtzoff, Federal Practice and Procedure § 1132 (1961).

A further reason for regarding the "clearly erroneous" rule as applicable in this case is that although the trial court did not have an opportunity to observe the witnesses *viva voce,* the chief judge who granted the preliminary injunction did. Presumably the trial court, in making its findings, allowed for this.

■■ Nor are we persuaded by the contention that Hurley was without authority to accept the plaintiffs' offer. The Rhode Island Statute of Frauds does not require that an agent act under written authority when signing a memorandum. Sholovitz v. Noorigian, 42 R.I. 282, 286, 107 A. 94, 95 (1919). As a

result of his telephone conversations with Thomas, who was the appropriate representative of Crucible, we are satisfied that Hurley had actual authority to enter into this agreement with the plaintiffs.

■ Leach also urges that the August 4 offer was made by the corporation and not by the plaintiffs individually, since the corporation's check was submitted as a deposit and the receipt therefor was taken in the corporation's name. This was a cash transaction and it does not appear that it was important to Crucible whether title was taken by the corporation or in the names of the two plaintiffs who were the principal officers of and sole stockholders in it. In fact, there is no indication in the record that there was ever any discussion between the parties as to how title was to be taken. We find no merit in this contention.

■ Principally, Leach contends that the agreement between Crucible and the plaintiffs failed to satisfy the Statute of Frauds.[9] Under Rhode Island law, the contract does not have to be in writing. The existence of a written memorandum showing that in fact there was an oral agreement is sufficient to take the case out of the statute. Cuddigan v. List, 93 R.I. 505, 177 A.2d 195 (1962); Sholovitz v. Noorigian, supra. In this connection, four documents are relevant: (1) The check for $10,000, dated August 4, 1965, from the plaintiffs to Hurley. This had a notation on the back that it was a deposit towards the $100,000 offer, gave the address of the property and identi-

---

pany and to accept the offer of the plaintiffs on behalf of the defendant Crucible Center Company.

5. That the real estate brokers involved in this transaction acted in good faith throughout and were true to their obligations as brokers for the defendant Crucible Center Company.

6. That the real estate brokers involved in this transaction executed written memoranda of the agreement of the defendant to sell said real property to the plaintiffs.

7. That the plaintiffs have at all times been ready, willing and able to purchase said real property in accordance with the terms of said agreement."

9. R.I.Gen.Laws 9–1–4 (1956), as amended, provides in pertinent part as follows:
  "Statute of frauds.—No action shall be brought:
   "*First.* Whereby to charge any person upon any contract for the sale of lands, tenements or hereditaments
  * * *
   *        *        *        *        *
   "Unless the promise or agreement upon which such action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person by him thereunto lawfully authorized."

fied Crucible as the owner. (2) Hurley's receipt, dated August 4, 1965, signed by Eastwood, which contained the same information that appeared on the back of the check. (3) The proposed sales agreement dated August 5, 1965, containing a detailed statement of the contract and (4) a handwritten note dated August 5, 1965, to Aisenberg, attorney for plaintiffs, signed by Hurley, and clipped to the sales agreements. This note read in part: "Enclosed are Agreements of Sale to be signed by your clients in accordance with the acceptance of the offer they made yesterday with respect to Crucible Steel Building on Carolina Avenue * * * "

■ It is well settled that a memorandum within the meaning of the Statute of Frauds may consist of several writings provided they relate to the same transaction. Not all the writings need be signed, provided the signed writing refers to the unsigned ones or is physically annexed thereto by the party to be charged. Restatement, Contracts § 208 (1932). See Cunha v. Gallery, 29 R.I. 230, 69 A. 1001, 18 L.R.A.,N.S., 616 (1908). Moreover, the parties may orally or by informal memorandum, or both, agree upon the essential terms of an agreement and bind themselves thereon, if that is their intention, even though they contemplate the execution later of a formal document to memorialize their agreement. The ultimate question is one of intent which must be determined on the facts and circumstances of each particular case. Cf. M. N. Landau Stores, Inc. v. Daigle, 157 Me. 253, 170 A.2d 673 (1961); Eastover Stores, Inc. v. Minnix, 219 Md. 658, 150 A.2d 884 (1959); Restatement, Contracts § 26 (1932).

■ The case of O'Donnell v. Smith, 123 A. 291 (R.I.1924), cited by Leach, is plainly consistent with the above proposition. In that case the court determined that the parties had not agreed on all terms and therefore had no intent to be bound at a point in time short of a formal signing. A case presenting a converse situation is Cuddigan v. List, supra at 510, 177 A.2d at 198 (1962), in which it was held that a receipt for the sale of land signed by the seller's agent satisfied the statute despite a recital that the deposit was "accepted subject to the approval of seller—and buyer—to conditions contained in an agreement of sale to be submitted * * *." In that case complainant, in addition to the receipt, received a key to the house and was told that the property was his. This was relevant not on the question of the legal sufficiency of the receipt as a memorandum within the Statute of Frauds but rather on the question of whether at the time a binding agreement had been completed. In other words, the court decided that the transfer of the key was evidence of an intent to be bound before the formal signing of the contract notwithstanding the reservations in the recital accompanying the deposit. Similarly, the crucial question here is, "When did the parties intend their agreement to come into existence?" In this case we think the district court was justified in finding that they intended the bargain to be struck on August 4, 1965, although the full formal agreement was to be signed later.

■ Finally, we must consider whether the four documents above mentioned are sufficient to satisfy the requirements of the Statute of Frauds. The law of Rhode Island on this point is detailed in Sholovitz v. Noorigian, supra at 285–286, 107 A. at 95 (1919):

"The note or memorandum sufficient to prevent the operation of the statute upon a contract for the sale of land need not have the formal precision usually found in a written contract or agreement. Such note or memorandum meets the requirements of the statute if it sets out who are the seller and the buyer, their respective intention to sell and to purchase, such a description of the subject-matter of the sale as may be applied to a particular piece of land, the purchase price, and the terms of payment if the sale is not for cash; and further such note or memorandum must be signed by the

party to be charged in the action or by his agent lawfully authorized."

A comparison of the criteria set forth in *Sholovitz*, supra and the four writings above mentioned reveals that the Statute of Frauds was clearly satisfied in the instant case. These writings stated the essential terms of the agreement and also indicated that the parties had already assumed contractual obligations although the final formal writing remained to be signed.

Affirmed.